IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

EDWARD WHITE,

            Plaintiff,

    vs.

COMMISSIONER OF SOCIAL
SECURITY,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)

CASE NO.  1:21-CV-00864-JDG

MAGISTRATE JUDGE
JONATHAN D. GREENBERG

**MEMORANDUM OF OPINION AND
ORDER**

Plaintiff, Edward White ("Plaintiff" or "White"), challenges the final decision of Defendant, Kilolo

Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a

Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act").   This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties,

pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I.      PROCEDURAL HISTORY

In December 2017, White filed applications for POD, DIB, and SSI, alleging a disability onset date

of November 21, 2012[2] and claiming he was disabled due to major depressive disorder, osteoarthritis of

the lower back, left knee, and bilateral hands and feet, and fracture of one or more bones in the bilateral

hands. (Transcript ("Tr.") at 15, 90, 103, 116, 132, 148, 165, 185, 205, 226, 249, 265.)  The applications

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.
[2] White amended his alleged onset date to December 14, 2017 during the September 2019 hearing.  (Tr.
15.)

were denied initially and upon reconsideration, and White requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On September 18, 2019, an ALJ held a hearing, during which White, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 22, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-25.)  The ALJ's decision became final on March 2, 2021, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On April 26, 2021, White filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13.)  White asserts the following assignment of error:

> (1) The ALJ erred when he found the consultative examiner's opinion unqualifiedly "persuasive," but did not incorporate all the limitations set forth therein into his RFC finding, and did not explain why they were excluded.

(Doc. No. 11.)


## II.      EVIDENCE

### A.      Personal and Vocational Evidence

White was born in July 1963 and was 56 years-old at the time of his administrative hearing (Tr. 15, 24), making him a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(e), 416.963(e).  He has a limited education and is able to communicate in English.  (Tr. 24.)  He has past relevant work as a forklift truck operator, mixer II, a composite job of a hand packager and a palletizer operator, and a composite job of a rental clerk, tool and equipment, and a tool and equipment repairer.  (*Id.* at 23.)

**B.     Relevant Medical Evidence[3]**

On December 21, 2017, White saw Gabrielle Lanese, DPT, for his third physical therapy session. (*Id.* at 804.)  White reported he felt like his legs were getting stronger, although he rated his pain as a 6.5/10.  (*Id.*)  Lanese noted White completed all exercises without any report of pain, and that after the session he reported lower extremity fatigue but no pain.  (*Id.* at 805.)

On January 4, 2018, White saw Yevgeniya Dvorkin Wininger, M.D., for follow up of his left knee pain.  (*Id.* at 914.)  White had previously reported knee pain that started the day he had first played basketball in years.  (*Id.*)  While he had not fallen or twisted his knee and he continued to play, he felt the pain as he was moving around.  (*Id.*)  White described the pain as throbbing and constant, although it varied in intensity, and he was now limping.  (*Id.*)  Straightening or flexing his knee aggravated the pain, while Naproxen, heat, and a brace alleviated it.  (*Id.*)  White denied locking, giving away, or popping, although he complained of leg spasms.  (*Id.*)  A December 2017 MRI revealed a meniscal tear and a "Grade 1" MCL sprain, with a small suprapatellar joint effusion.  (*Id.* at 915.)  White reported he had been to physical therapy and it helped, although Dr. Wininger noted White had not been compliant with his home exercise program.  (*Id.*)  White told Dr. Wininger he was going up and down stairs without much pain and his pain had improved, although he was taking Naproxen once a day without much relief.  (*Id.*)

On examination, Dr. Wininger found normal strength, intact sensation to light touch bilaterally, normal, narrow-based gait, knee flexion to 100 degrees, full knee extension, tenderness to palpation over the medial joint line, grossly normal patellar alignment, negative anterior and poster drawer tests, negative Lachman's test, pain with valgus stress test, McMurray's test positive for pain only, and no instability. (*Id.* at 917-18.)  Dr. Wininger noted White's left knee pain was "improving w[ith] therapy and time." (*Id.*

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  However, as White failed to provide a "Facts" section as required by the Initial Order (Doc. No. 5), the Court's discussion is limited to the evidence cited by the Commissioner.

at 918.)  Dr. Wininger ordered White to continue physical therapy and improve his compliance with his home exercise program, switched White's Naproxen to Mobic, and told him if he was still experiencing significant symptoms, he could consider knee injections.  (*Id.*)

On January 15, 2018, White saw DPT Lanese for another physical therapy session.  (*Id.* at 935.) Lanese noted White's gait was independent.  (*Id.*)  During the session, Lanese progressed White's stair exercises and noted White complained of mild pain when stabilizing on his left lower extremity.  (*Id.* at 937.)  Lanese found White had met his short-term goals of requiring minimal verbal cueing for his home exercise program and of reporting decreased average pain to 5/10.  (*Id.*)

On January 22, 2018, White saw Kimberly Foley, CNP, for follow up.  (*Id.* at 907.)  White brought disability paperwork for his knee problem to the appointment.  (*Id.*)  White complained of bilateral tingling in his feet, mainly when taking a shower, two to three times a week over the past year.  (*Id.*)  The tingling lasts the duration of his shower and then resolves.  (*Id.*)  On examination, Foley found full strength and normal gait.  (*Id.* at 908.)  Foley noted a complete physical exam was performed and was satisfactory.  (*Id.*)

On March 16, 2018, White saw Dr. Wininger for follow up.  (*Id.* at 1698.)  Dr. Wininger noted six physical therapy sessions since his last appointment with her, but then White had multiple no shows after that.  (*Id.* at 1699.)  White reported he missed appointments because both of his sons had seizures and he was in the middle of moving.  (*Id.*)  White told Dr. Wininger therapy had been going well, and he did his home exercise program when he was able.  (*Id.*)  White wanted to return to therapy, as things had been progressing well and his pain had improved.  (*Id.*)  White reported he was starting to have throbbing pain on the inside of the knee and felt the knee was not stable.  (*Id.*)  White also endorsed popping and locking of the knee.  (*Id.*)  White told Dr. Wininger ice made the pain worse, and Mobic was not helping.  (*Id.*)

On examination, Dr. Wininger found normal strength, intact sensation to light touch bilaterally,

4

normal, narrow-based gait, knee flexion to 80 degrees, full knee extension, tenderness to palpation over the medial joint line, grossly normal patellar alignment, negative anterior and poster drawer tests, negative Lachman's test, pain with valgus stress test, McMurray's test positive for pain only, and no instability. (*Id.* at 1702.)  Dr. Wininger again noted White's left knee pain was "improving w[ith] therapy and time." (*Id.*)  Dr. Wininger changed Mobic to Voltaren, ordered a playmaker knee brace, referred White to orthopedic surgery for a surgical evaluation, and referred White to physical therapy.  (*Id.* at 1703.)

On April 2, 2018, White saw Eric Shadrach, PT, for physical therapy.  (*Id.* at 1704.)  White reported worsening knee pain over the past month, and that now his right knee was starting to hurt as well. (*Id.* at 1705.)  Strength testing done that day revealed full strength, except for 4+/5 on left hip abduction and left hip extension.  (*Id.*)  Shadrach noted White favored his left lower extremity on transfers.  (*Id.*) White demonstrated an antalgic gait that favored his left, and he showed a reciprocal, antalgic gait with poor eccentric control on stairs.  (*Id.*)  Shadrach noted White presented with improved lower extremity strength but continued functional and flexibility issues.  (*Id.* at 1706.)  White reported less pressure in his knee at the end of the session.  (*Id.*)

On April 28, 2018, White saw Dariush Saghafi, M.D, for a physical consultative examination.  (*Id.* at 970-72.)  White reported he continued physical therapy for his left knee pain, which helped somewhat, although there were still days where the pain was overbearing.  (*Id.* at 970.)  White reported pain medication did not help his knee.  (*Id.*)  On examination, Dr. Saghafi found lateral meniscal tenderness and sensitivity which White described as "sharp lancinating pain" through the lateral patellar region, full strength of the upper and lower extremities, normal tone and bulk of the upper and lower extremities, with no signs of focal atrophy, no evidence of a resting or action tremor, no orbiting or pronator drift, intact sensation, negative Phalen's, Tinel, and Hoover signs, absent Romberg and Babinski signs, left antalgic gait with minimal predisposition for falls, and a slight buckle of the left knee when walking and turning.

(*Id.* at 972.)  Dr. Saghafi determined White likely suffered from a subacute left lateral meniscal tear that was moderate in severity.  (*Id.*)  Dr. Saghafi opined White could "lift, push, and pull sufficiently to be able to perform ADL's and pick up to 40 lbs."  (*Id.*)  Dr. Saghafi further opined White could bend, walk, and stand for up to 30 minutes.  (*Id.*)

On May 7, 2018, White went to the emergency room with complaints of bilateral knee pain.  (*Id.* at 979.)  White reported he could not stand the pain anymore.  (*Id.*)  David Zimcosky, PA, noted White ambulated independently.  (*Id.*)

On May 11, 2018, White went to Lakewood Urgent Care and reported he had a torn meniscus in his left knee and was experiencing similar symptoms in his right knee.  (*Id.* at 988.)  White stated his right knee hurt as bad as the left, and that he had been given therapy for his right knee as well as his left.  (*Id.*)  On examination, Nicolas Young, D.O., found mild swelling and mild tenderness to palpation along the medial right knee joint line, pain with McMurray's test on the right, intact and symmetric strength and sensation, with normal color, texture, and turgor.  (*Id.* at 989.)  Dr. Young ordered an MRI of the right knee and directed White to continue physical therapy and to add physical therapy for his right knee.  (*Id.*)

On June 29, 2018, White saw Foley for routine follow up.  (*Id.* at 994.)  White reported a recent knee injection, and that exercising and riding his bike helped his knees.  (*Id.*)  On examination, Foley found full strength of the upper and lower extremities against resistance, no edema, and normal gait.  (*Id.* at 995.)  Foley noted leg cramps and chronic pain of the bilateral knees.  (*Id.*)

On October 5, 2018, White went to MetroHealth Parma Hospital complaining of increased right knee pain over the past three weeks, and mild to moderate left knee pain.  (*Id.* at 1018.)  White reported his knees were worse with steps and described the pain as throbbing and constant.  (*Id.*)  White also endorsed an occasional "'popping'" sensation with extension after sitting for long periods of time.  (*Id.*)  White reported intermittent attempts at his home exercise program.  (*Id.*)  On examination, Susan Krueger,

PA-C, found no redness, mild peripatellar soft tisse swelling, no warmth, no effusion, a range of motion of 0 to 120 degrees on the right and o to 110 degrees on the left, no MCL or LCL instability, negative AP drawer test, equivocal McMurray's on the right with no joint line tenderness, mild tenderness to palpation along the anteromedial joint line on the left, and bilateral patella grind.  (*Id.* at 1019.)  Kreuger continued White's pain medication, discussed the importance of performing daily home exercises, and administered bilateral steroid injections to the knees that provided "good short term relief after injection."  (*Id.*)

On January 16, 2019, White saw Maryann Ambrose, APRN-CNP, with complaints of right shoulder pain, especially with movement, after injuring his shoulder in July 2018 while lifting equipment at work.  (*Id.* at 1729.)  White denied gait problems.  (*Id.* at 1730.)  On examination, Ambrose found a full range of motion with some discomfort in the AC joint on the right, with a strong radial pulse and normal sensation bilaterally.  (*Id.*)  Ambrose found full and painless range of motion of the left upper extremity.  (*Id.*)  Imaging revealed mild degenerative arthropathy at the acromioclavicular joint and mild degenerative sclerotic changes at the humeral tuberosity.  (*Id.*)  Ambrose directed White to continue Voltaren and ice packs.  (*Id.* at 1731.)

On February 2, 2019, White saw Kristin Klepser, APRN-CNP, with complaints of back pain that started four days earlier.  (*Id.* at 1531.)  White reported sharp pain when he bent over or lifted heavy objects.  (*Id.*)  White also reported back spasms and that the pain occasionally radiated into his right buttock.  (*Id.*)  White denied numbness/tingling, weakness, and gait problems.  (*Id.*)  On examination, Klepser found no midline tenderness, range of motion with flexion slightly limited by pain, pain on the right with a straight leg raise test, and intact muscle strength and sensation of the lower extremities bilaterally.  (*Id.* at 1532.)  Klepser diagnosed White with muscle spasms of the back and acute right-sided low back pain with right-sided sciatica.  (*Id.*)  Klepser prescribed Flexeril and a Toradol injection.  (*Id.*)

On March 9, 2019, White saw Paula Finton, M.D., with complaints of right shoulder pain and

lower back discomfort.  (*Id.*at 1265.)  White reported his symptoms were aggravated by lifting a lot of boxes and a heavy TV.  (*Id.*)  White reported Toradol and Flexeril improved his pain slightly, but he was still experiencing symptoms.  (*Id.*)  White requested a refill of the Flexeril, as it was helpful.  (*Id.*)  On examination, Dr. Finton found full range of motion of the shoulders with no tenderness, normal gait, and intact strength.  (*Id.* at 1267.)  Dr. Finton ordered an x-ray and prescribed Flexeril.  (*Id.*)

**C.    State Agency Reports**

On February 26, 2018, Maureen Gallagher, D.O., M.P.H., opined White could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and has the unlimited ability, other than shown for lift and/or carry, to push/pull.  (*Id.* at 97-98, 110-11.)  Dr. Gallagher further opined White could frequently kneel, crouch, and crawl, but his ability to climb ramps/stairs, ladders/ropes/scaffolds, balance, and stoop was unlimited.   (*Id.* at 98, 111.)

On May 8, 2018, Dr. Gallagher again opined the same RFC.  (*Id.* at 126-27, 142-43, 158-59.)

On July 23, 2018, Dr. Gallagher opined the same limitations for lifting/carrying, standing/walking, sitting, and pushing/pulling.  (*Id.* at 177-79, 197-99, 218-20, 239-41.)  Dr. Gallagher modified the RFC to occasionally climbing ramps/stairs, never climbing ladders/ropes/scaffolds, frequently balancing, unlimited stooping, occasionally kneeling, frequently crouching, and occasionally crawling.  (*Id.* at 178, 198, 218-19, 239-40.)  White must avoid concentrated exposure to hazards.  (*Id.* at 179, 199, 220, 241.)

On October 26, 2018, on reconsideration, Kalpna Desai, M.D., opined White could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and could occasionally push and pull with the bilateral lower extremities.  (*Id.* at 258, 260, 274-76.)  Dr. Desai further opined White could frequently climb ramps/stairs, never climb ladders/ropes/scaffolds, frequently balance, stoop, and crouch,

8

and occasionally kneel and crawl.  (*Id.* at 259, 275.)  White must avoid even moderate exposure to hazards.  (*Id.* at 260, 276.)

## D.  Hearing Testimony

During the September 18, 2019 hearing, White testified to the following:

- He lives in a two-floor house with his three adult sons.  (*Id.* at 37-38.)  Two sons have seizures all the time.  (*Id.* at 37.)  He must watch his sons, and four or five months before the hearing he had to bring one of his sons up from the basement while he was having a seizure.  (*Id.*)  Another time he had to catch one of his sons to keep him from falling during a seizure and he aggravated his arm.  (*Id.* at 38.)

- He has a driver's license.  (*Id.* at 39.)  He currently works as a shuttle bus driver.  (*Id.*)  He was hired on April 15, 2019.  (*Id.*)  He worked 40 hours a week until a month ago, when his hours were cut to 19-20 hours a week while the Cleveland Browns were at the hotel.  (*Id.* at 40.)  He was now back up to 40 hours a week.  (*Id.*)  The shuttle he drives is a big van.  (*Id.*)  He lifts luggage as part of his job.  (*Id.* at 41.)  The small ones are light, but the heavy ones are 60-70 pounds.  (*Id.*)  He cannot leave his job because he must care for his two sons and otherwise, they'd be homeless.  (*Id.* at 45.)  He was applying for jobs in 2018, but no one was hiring him.  (*Id.* at 70.)  He was ready to work though.  (*Id.*)  If the shuttle bus driver position had opened in 2018, he could have done it back then.  (*Id.*)

- It took a year and a half for his left knee to heal, and then his right knee started hurting.  (*Id.* at 57.)  He tore his left meniscus playing basketball.  (*Id.* at 57-59.)  He hasn't had surgery on his knee.  (*Id.* at 60.)  He received injections three to four times.  (*Id.*)  He had to wear braces on both knees.  (*Id.*)  He is going to the doctor soon for the doctor to decide whether anything else needs to be done with his knees.  (*Id.* at 62.)

- He also had bad back spasms.  (*Id.*)  He received injections for his lower back pain.  (*Id.* at 63.)  The injections helped some, but he was still in pain.  (*Id.*)  He had to constantly take Tylenol and Diclofenac.  (*Id.*)  No one has recommended surgery for his back.  (*Id.*)  He drives through the pain.  (*Id.* at 64.)  Sometimes he tells his boss he cannot do certain things.  (*Id.*)  If the garbage is too heavy, he cannot lift it.  (*Id.* at 73.)  Or if work wants him to help housekeeping, he can push a basket, but he cannot lift all the laundry into the laundry chute.  (*Id.* at 74.)  He tries to avoid bending and crouching as much as possible.  (*Id.* at 72.)  If he does not have to drive anyone anywhere, he walks around the hotel.  (*Id.* at 75.)  He gets tired sometimes and tries to take a break when he can.  (*Id.*)

- His doctors are talking about surgery for his right shoulder.  (*Id.* at 65.)  His right shoulder throbs.  (*Id.* at 74.)  He has the most problems when he reaches out with his right arm.  (*Id.*)

- Sometimes his pain wakes him up when he is asleep. (*Id.* at 66.) He naps during the day, but it does not interfere with his work schedule. (*Id.*) His sons handle the household chores. (*Id.*) He cannot do yard work anymore. (*Id.* at 67.) His son who does not have seizures does the yard work. (*Id.*) He picks out the groceries, but his sons unload the groceries. (*Id.*) He has not done any hobbies in years. (*Id.* at 68.)

The VE testified White had past work as a forklift truck operator, mixer II, a composite job of a hand packager and a palletizer operator, and a composite job of a rental clerk, tool and equipment, and a tool and equipment repairer. (*Id.* at 78-79.) The ALJ then posed the following hypothetical question:

> The first hypothetical – and for each of these assume the individual has the same age, education, and the experience you just characterized as the claimant. The first is capable of medium level of exertion; frequent climbing ramps and stairs; no climbing ropes, ladders, and scaffolds; frequent balance, stoop; occasional kneel; frequent crouch; occasional crawl; no exposure to hazards such as unprotected heights or moving mechanical parts. Based on this hypothetical, would the individual be able to perform the past work, either as actually or generally performed?

(*Id.* at 80.)

The VE testified the hypothetical individual would be able to perform White's past work as a forklift truck operator and a composite job of a hand packager and a palletizer operator. (*Id.* at 81.) The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as linen room attendant, laundry worker, and rack loader. (*Id.* at 82.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

10

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, White was insured on his alleged disability onset date, December 14, 2017, and remained insured through March 31, 2018, his date last insured ("DLI"). (Tr. 15-16.) Therefore, in order to be entitled to POD and DIB, White must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2.    The claimant engaged in substantial gainful activity during the following periods: April 2019, through at least September 2019.  (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.    The claimant has the following severe impairments: lumbar degenerative disc disease and osteoarthritis; and bilateral knee osteoarthritis status post torn left meniscus.  (20 CFR 404.1520(c) and 416.920(c)).

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he can frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance or stoop; occasionally kneel; frequently crouch; occasionally crawl; and he can have no exposure to hazards such as unprotected heights or moving mechanical parts.

7.    The claimant is capable of performing past relevant work as a forklift truck operator, and as a composite position comprised of a hand packager and a palletizer operator 1.  This work does not require the performance of work-related

activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

8.      The claimant has not been under a disability, as defined in the Social Security Act, from December 14, 2017, through the date of this decision.  (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 18-25.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).   Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law

13

Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.    ANALYSIS

In his sole assignment of error, White argues the ALJ "erred when he found the consultative examiner's opinion unqualifiedly 'persuasive,' but did not incorporate all the limitations set forth therein into his RFC findings and did not explain why they were excluded."  (Doc. No. 11 at 4.)  White asserts

14

that the ALJ "rejected as unpersuasive" the state agency reviewing physicians' opinions that White could perform light work and found examining physician Dr. Saghafi's opinion persuasive as it was supported by his findings but failed to incorporate Dr. Saghafi's lifting or standing/walking limitations into the RFC without an explanation why.  (Doc. No. 11 at 6.)

The Commissioner responds that, contrary to White' assertion, the ALJ explained why he did not adopt all of Dr. Saghafi's limitations into the RFC.  (Doc. No. 13 at 7-9.)  In addition, even if the ALJ erred, any error would be harmless as White's own testimony supports the ALJ's finding that White could return to his past work as a forklift truck operator.  (*Id.* at 9.)

Since White's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations,

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5); 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in

16

paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the opinions of Dr. Saghafi and the state agency reviewing physicians as follows:

> The opinion of consultative medical examiner Dariush Saghafi, MD is persuasive. (Ex. 6F). On April 28, 2018, Dr. Saghafi examined the claimant and opined that he suffered from a sub-acute left lateral meniscus tear that was moderate in severity, and that he could lift up to 40 pounds, and stand or walk for up to 30 minutes. This opinion is supported by Dr. Saghafi's findings upon examination, which indicated that the claimant presented with tenderness and sensitivity in the knees, and a left-sided antalgic gait with a minimal predisposition to falls. However, the claimant was in no acute distress, with normal arm swing during ambulation, and normal muscle tone and bulk for his age. He had no signs of atrophy, myotonia, tremor, or fasciculations. He had normal and symmetrical reflexes, largely full strength in all extremities, and intact sensation. This suggests that the claimant is capable of less than the full range of medium work. Therefore, this opinion is persuasive.
>
> The opinions of State agency medical consultants Maureen Gallagher, DO, MPH and Kalpna Desai, MD are unpersuasive. On February 26, 2018, Dr. Gallagher reviewed the evidence available at the initial determination, and opined that the claimant could perform light work with postural limitations. (Ex. 1A; Ex. 2A). On May 8, 2018, Dr. Gallagher reviewed the evidence, and affirmed her prior opinion. (Ex. 3A; Ex. 4A). On July 23, 2018, Dr. Gallagher reviewed the evidence, and added some postural and environmental restrictions. (Ex. 6A-9A). On October 26, 2018, Dr. Desai reviewed the evidence available at the reconsideration determination, and affirmed the opinion of Dr. Gallagher. (Ex. 12A; Ex. 13A). These opinions are inconsistent

> with the evidence in the record, which indicates that while the claimant presented with tenderness in his knees and back, he generally was in no acute distress with full strength, good range of motion, normal and symmetrical reflexes, intact sensation, and a normal and independent gait. He reported engaging in activities like lifting heavy boxes and televisions and playing basketball, and imaging showed mild to moderate degenerative changes and a left meniscal tear. The claimant treated conservatively with medication, physical therapy, injections, and knee braces.  These findings suggest that the claimant can perform less than the full range of medium, not light, work. Therefore, these opinions are unpersuasive.

(Tr. 22-23.)

Earlier in the RFC analysis, the ALJ found:

> As noted above, the claimant has worked full-time as a shuttle bus driver, which the vocational expert classified as medium exertion level work, since April 2019 and continuing 6 months later in September 2019 at the time of the hearing. This work is entirely consistent with the Residual Functional Capacity and the result of this decision that he is not disabled, but capable of performing certain past relevant work and other work at the medium exertion level, as set forth below.

(*Id.* at 21.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 404.1520c(a), 416.920c(a).  Reading the opinion as a whole, it is evident to the Court the ALJ rejected Dr. Saghafi's lifting and standing/walking limitations on the basis of conflicting evidence, including normal muscle tone and bulk, no signs of atrophy or tremor, "largely full strength in all extremities," and intact reflexes and sensation.  (*Id.* at 20-22.)  Contrary to White's implication, while the ALJ indeed rejected the state agency reviewing physicians' opinions that he could perform light work, it was because the ALJ found White was capable of performing a greater level of exertion than light as opposed to a lesser one.  (*Id.* at 22-23.)  It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While White would weigh the evidence differently, it is not for the Court to do so on appeal.  White points to no contrary lines of evidence the ALJ ignored or overlooked.  (Doc. No. 11.)

18

"This Court has followed the Sixth Circuit and reviewed the ALJ's decision as a whole." *Malone*, 2011 WL 5520292, at *2. While the ALJ's discussion of Dr. Sagahafi's opinion is less than ideal in terms of clarity, a perfect opinion is not required. *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

There is no error.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: June 10, 2022

<u>    s/ Jonathan Greenberg</u>
Jonathan D. Greenberg
United States Magistrate Judge

19